1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KEVIN ROSS BEAM,                    No. 2:11-CV-0605-KJM-CMK-P

12              Petitioner,

13        vs.                            SUPPLEMENTAL FINDINGS AND
                                         RECOMMENDATIONS
14   V.W. KNIPP,

15              Respondent.

16   _____/

17              Petitioner, a state prisoner proceeding pro se, seeks to bring a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court are petitioner's amended

19   petition for a writ of habeas corpus (Doc. 27), respondent's answer (Doc. 40), and petitioner's

20   reply (Doc. 44).

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

# I. BACKGROUND

A.    **Facts**[1]

The state court recited the following facts[2], and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> The victim was referred to as Jane Doe at trial. Doe worked at a gas station in Cool. She heard the police were at her mother's house and twice left work to see what was going on. Doe's mother said the police were looking for defendant. At the house there were two police officers present and then a SWAT team arrived.
>
> Back at the gas station, a coworker told Doe that defendant was looking for her. Defendant phoned Doe, telling her he needed to get out of town because the police were looking for him. Doe did not agree at first to help defendant; he phoned her again.
>
> Doe spoke with her supervisor, F. Pearce, about defendant's phone calls. Pearce suggested Doe call the police. Pearce called the police; Doe and Pearce met the police at a market near the gas station. Doe told the officers of the residence where defendant could be located. . . . .

At footnote 3, the state court observed:

> The police claimed Doe would not tell them were defendant was. Defendant was wanted for burglary or possession of stolen property.

The state court continued its discussion as follows:

> . . . They told her they could not arrest someone at another's residence without a warrant.
>
> Doe and Pearce came up with a plan to get defendant arrested; Doe would pick him up and leave him at a motel. Pearce would follow Doe to ensure her safety. Pearce gave Doe $60 for the motel room. The police told Doe this plan was a terrible idea and not to do it. It would not be safe.
>
> Despite this warning, Doe put the plan in action and picked up defendant and drove through Georgetown. She drove past the car wash and saw Pearce's car waiting. Pearce pulled out and attempted to follow

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

[2]    These facts are taken from the California Court of Appeal's decision on direct appeal. Because petitioner only challenged the sufficiency of the evidence as to a conviction for false imprisonment, the court did not summarize those facts specifically relating to petitioner's conviction of forced oral copulation.

1    them but defendant saw the car and told Doe to speed up.  Between
     Coloma and Placerville, Pearce lost sight of Doe's car.  Pearce, with her
2    husband, went to a diner and waited there several hours.
             Defendant directed Doe to drive from Placerville to Cameron Park.
3    From there they drove to Auburn.  After trying to check into motels that
     were too expensive, they went to the Elmwood Motel.  Once there, Doe's
4    phone rang several times as Pearce was trying to reach her.  Doe answered
     once, but did not speak long.  Defendant got angry about the calls and his
5    posture changed.  Doe was scared and felt trapped; defendant was tense.
     Doe told defendant she needed to leave; she had to get home to her child.
6    Defendant responded she was not going anywhere.  Defendant told Doe
     that he thought the police were looking for him because of Toby Kaiser.
7    He said Sheri had probably turned him in because he killed Kaiser, cut off
     his hands, and used them in burglaries. . . .
8

9    At footnote 4, the court added:

10           The police did not investigate this allegation further because it was
     outside their jurisdiction.  There is no mention of this crime in the
11   probation report.

12   The court continued:

13           . . . When Doe learned this, her attitude about leaving changed; she was
     scared.
14           Defendant wanted to get a local newspaper to see why the police
     were looking for him, so they went to Doe's gas station to get one.
15   Defendant took the car keys with him when he went into the gas station.
     While he was gone, Doe called a friend, A. Meza.  It was a poor
16   connection and Meza hung up.  Doe and defendant returned to the motel.
             Doe again told defendant she needed to go home to her child.
17   Defendant was still angry.  He grabbed Doe and in certain terms told her
     of his sexual intentions.  Doe declined.  Defendant asked what if he went
18   away forever and she could not do this.  Doe thought he was referring to
     his killing Kaiser.  Defendant proceeded to sexually assault Doe, despite
19   her contrary plea.
             Defendant heard the door move and jumped up, saying it was time
20   to leave.  As Doe got dressed, she heard defendant masturbating in the
     bathroom.
21           They left the motel and went to a gas station.  While defendant was
     at a pay phone, Doe called Meza again and told him to call the police.
22   Defendant got back in the car and announced they were going to Auburn
     to get some alcohol.  When they stopped at a store, defendant left the keys
23   in the car.  Doe drove off and called 911.

24   ///

25   ///

26   ///

3

B.    **Procedural History**

Petitioner was convicted of forcible oral copulation and false imprisonment.  The trial court found true allegations that petitioner had a prior serious felony conviction and had served two prior prison terms.  Petitioner was sentenced to 24 years in prison.  The conviction and sentence were affirmed on direct appeal and the California Supreme Court denied direct review.  Petitioner then filed three state court post-conviction actions, all of which were denied.

The matter is before the undersigned pursuant to the District Judge's September 30, 2014, order directing development of supplemental findings and recommendations.  In that order, the court stated:

> Petitioner . . . argues that the magistrate judge has not addressed several aspects of his petition, as discussed below.  The court refers the matter back to the magistrate judge for consideration of these issues.
>
> Petitioner claims trial counsel was ineffective for failing to analyze Jane Doe's cell phone records, which would have led counsel to Amber Royal, who in turn would have said that on the evening in question Jane Doe and petitioner purchased a bag of methamphetamine from her.  ECF No. 27 at 23, Decl. Of Amber Royal, ECF No. 27-3 at 77-79.  Royal avers that "Kevin and [Jane Doe] did call, and come to my home to purchase methamphetamines," and "[Jane Doe] asked if there was a cheap motel anywhere that I knew of."  ECF No. 27-3 at 79.  Petitioner also argues the magistrate judge did not address petitioner's claim that had trial counsel analyzed these records, he could have impeached the victim's testimony about the timeline of the evening of the incident.  Objections, ECF No. 49 at 5; ECF No. 27 at 14, 27-3 at 53-63 (telephone records).  The magistrate judge has not addressed these claims.
>
> Petitioner argues that the magistrate judge did not address his claim that trial counsel was ineffective for failing to convey a plea offer to him.  Objections, ECF No. 49 at 6-7; *see* ECF No. 27-3 at 41 (letter to appellate counsel discussing plea offer).  Petitioner argues additionally that the magistrate judge erred in rejecting his claim that at least one member of the jury was aware petitioner was wearing bright orange jail shoes.  ECF No. 49 at 6.  The magistrate judge says only that "absent evidence that they [*sic*] jury saw the shoes, petitioner cannot state a claim for habeas relief."  ECF No. 48 at 8.  As petitioner notes, however, in his declaration he says that at least one member of the panel appeared to notice his shoes and pointed them out to other members of the panel.  ECF No. 27-3 at 1 ¶ 6.  These issues are referred back to the magistrate judge.
>
> Petitioner finally alleges counsel was ineffective for developing and using information to impeach Faith and Jerry Pearce, witnesses who corroborated a portion of Jane Doe's testimony.  ECF No. 27 at 9, 89 & 27-3 at 39.  As the magistrate judge does not address this

4

1     claim, it also is referred back to him for inclusion in supplemental findings

2     and recommendations.

3

4                        **II.  STANDARDS OF REVIEW**

5         Because this action was filed after April 26, 1996, the provisions of the

6 Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

7 applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

8 (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

9 does not, however, apply in all circumstances.  When it is clear that a state court has not reached

10 the merits of a petitioner's claim, because it was not raised in state court or because the court

11 denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

12 habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

13 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

14 petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

15 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

16 perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

17 evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

18 petition de novo where state court had issued a ruling on the merits of a related claim, but not the

19 claim alleged by petitioner).  When the state court does not reach the merits of a claim,

20 "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

21         Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

22 not available for any claim decided on the merits in state court proceedings unless the state

23 court's adjudication of the claim:

24                  (1) resulted in a decision that was contrary to, or involved an
                 unreasonable application of, clearly established Federal law, as determined

25                  by the Supreme Court of the United States; or

26 / / /

1
2

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3 Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is

4 "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

5 standards, "clearly established law" means those holdings of the United States Supreme Court as

6 of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

7 (citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not

8 the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en

9 banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas

10 relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742,

11 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)).

12 For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

13 to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a

14 state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

15 contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

16 created by state conduct at trial because the Court had never applied the test to spectators'

17 conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's

18 holdings.  See Carey, 549 U.S. at 74.

19 In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

20 majority of the Court), the United States Supreme Court explained these different standards.  A

21 state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

22 the Supreme Court on the same question of law, or if the state court decides the case differently

23 than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

24 court decision is also "contrary to" established law if it applies a rule which contradicts the

25 governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

26 that Supreme Court precedent requires a contrary outcome because the state court applied the

wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

determine first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040,

1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

State court decisions are reviewed under the far more deferential "unreasonable

application of" standard where it identifies the correct legal rule from Supreme Court cases, but

unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

that federal habeas relief may be available under this standard where the state court either

unreasonably extends a legal principle to a new context where it should not apply, or

unreasonably refuses to extend that principle to a new context where it should apply.  See

Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

decision is not an "unreasonable application of" controlling law simply because it is an erroneous

or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found

even where the federal habeas court concludes that the state court decision is clearly erroneous.

See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

As with state court decisions which are "contrary to" established federal law, where a state court

decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

/ / /

/ / /

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

## III.  DISCUSSION

As identified in the District Judge's order, the following claims of ineffective assistance of counsel are before the court: (1) failure to analyze Jane Doe's cell phone records; (2) failure to convey a plea offer; (3) allowing petitioner to be viewed by the jury wearing bright orange jail shoes; and (4) failure to develop and use information to impeach Faith and Jerry Pearce.[3]  Additionally, the District Judge has referred the matter back to the undersigned for further review of petitioner's claim that his due process rights were violated as a result of being seen by the jury wearing orange jail shoes.

### A.      Due Process Claim

Petitioner claims:

> A defendant should not be compelled to appear before a jury in prison or jail clothing because of possible impairment of the right to be presumed innocent (citations omitted). . . .
>     In the unique factual situation presented by this case Petitioner was forced to appear before the jury panel in jail issue bright orange canvas shoes.  The distinctive nature of these shoes is unmistakable.  Thus, the potential jurors saw a very large man wearing what everyone knows is jail issue.  (Ex. 11, Decl. Of K.R. Beam).

---

[3]      The court will review these claims in the context of both trial and appellate counsel.

1  In his declaration at Exhibit 11 to the amended petition, petitioner states as follows regarding

2  orange jail shoes:

> 4.     That I was forced to appear on my first day of jury trial in
> jail issue bright orange canvas shoes because Mr. Rekoon has not provided
> me a pair of street shoes.
> 5.     That Mr. Rekoon told me, when I informed him that I was
> wearing jail shoes, to keep my feet under the table.
> 6.     That I observed several potential jurors, at least one of
> which was seated on my jury, appear to recognize their significance and
> immediately thereafter draw other jurors' attention to them.

8          In Estelle v. Williams, 425 U.S. 501 (1976), the Supreme Court held that a

9  criminal defendant may not be compelled to stand trial before a jury in identifiable prison or jail

10  clothing.  However, ". . .the failure to make an objection to the court as to being tried in such

11  clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to

12  establish a constitutional violation."  Id. at 512-13.  In this case, petitioner does not argue, and

13  the record does not reflect, that his trial counsel ever objected to petitioner appearing before the

14  jury (or, in this case, potential jury) wearing orange jail shoes.  Therefore, petitioner has not

15  alleged sufficient facts to show a due process violation and this claim should be denied.[4]

16      **B.     Ineffective Assistance of Counsel Claims**

17          The Sixth Amendment guarantees the effective assistance of counsel.  The United

18  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

19  Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

20  all the circumstances, counsel's performance fell below an objective standard of reasonableness.

21  See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to

22  have been the result of reasonable professional judgment.  See id. at 690.  The federal court must

23  then determine whether, in light of all the circumstances, the identified acts or omissions were

24  outside the wide range of professional competent assistance.  See id.  In making this

25  ─────────────────

26      [4]     Whether trial and appellate counsel were ineffective in this regard is discussed
below.

determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S. at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

The Strickland standards also apply to appellate counsel. See Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.")  Further, there is, of course, no obligation to raise meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88.  Thus, counsel is not deficient for failing to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to

1  demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors,

2  he probably would have prevailed on appeal.  See id. at n.9.

3                    1.    Cell Phone Records

4                    As indicated by the District Judge, this claim is set forth at Doc. 27, pages14 and

5  23.[5]  Relative to cell phone records, petitioner states the following at page 14:

6                    On August 7, 2008, Petitioner gave counsel a specific thing Mr.
           Rekoon failed to do which would have resulted in a different result at trial,
7          investigate the telephone records of the alleged victim which impeached her
           testimony on several critical time line points.  (Exhibit 26, 8-7-08 letter;
8          Exhibit 25, telephone records).  This, in turn, would have led to an
           interview with Amber Royal who was ready, willing, and able to
9          incriminate herself in order to tell the truth: the alleged victim called her
           with a request to purchase methamphetamine and later arrived at her house
10         and actually purchased the drugs herself.  (Exhibit 28, Declaration of
           Amber Royal and handwritten letter of same).

11

12  At page 23, petitioner states as follows regarding cell phone records:

13                    Petitioner had a "substantive" right to have his attorney investigate
           all facts and law relative to his case. . . . He failed to pursue the telephone
14         records (Ex. 27) which could have been used to impeach the Pearces and
           the alleged victim.  They also would have led to Amber Royal who was
15         ready, willing, and able to incriminate herself in order to confirm that the
           alleged victim was the one who asked to and did purchase drugs form her
16         that day.  (Ex. 28, Decl. of A. Royal). . . .

17  Petitioner attaches to the amended petition as Exhibit 28 the unsigned declaration of Amber Royal

18  from April 2011.[6]  In this declaration, Ms. Royal states as follows:

19                    4.    On the night prior to the arrest of Kevin Ross Beam on the
           charges related to this case, I received a telephone call from him and Nicole
20         Leffler wherein they inquired if I had methamphetamine for sale to which I
           replied yes.
21                    5.    Shortly thereafter a green car, of a make and model I was not
           familiar with, parked across the street from my home and both Kevin and
22         Nicole exited and came to my home.

23  / / /

24  _____

25     [5]     It appears that references by the District Judge to page numbers are those
    indicated on the court's docket header, not the page numbers listed by petitioner.

26     [6]     The unsigned declaration does not indicate the date, only the month and year.

6.     They purchased methamphetamine from me on the evening in question.
7.     Nicole then asked me if I knew where there was a cheap motel.
8.     I told them there was none in the area, and that the closest place I knew of was either in Placerville, where they did not want to go because Kevin was on the run, or in Auburn.
9.     They decided, in my presence, to go to Auburn.
10.    They then left my home with a sizeable amount of methamphetamine.
11.    I was not contacted by any defense attorney, investigator, or other personnel prior to or during Kevin Beam's trial.

The court finds that petitioner has not stated a claim sufficient for relief to be granted on his claim that counsel was ineffective with respect to phone records. There is nothing in the amended petition or Ms. Royal's unsigned declaration which indicates what, if anything, useful to petitioner's case investigation of cell phone records would have shown. While petitioner claims that an investigation into cell phone records would have impeached the victim, he does not identify what that impeachment evidence would have been, or how it would have been uncovered through investigation of cell phone records. Nor does petitioner state how anything Ms. Royal says would have affected his case. Petitioner has not shown that counsel's performance was deficient or that any prejudice resulted from failure to investigate cell phone records.[7]

2.    Plea Offer

As indicated by the District Judge, this claim is based on Exhibit 23 to the amended petition. In that exhibit, which is a July 23, 2008, letter from petitioner to appellate counsel, petitioner states the following regarding a plea offer:

Sir, as I've explained, counsel (Rekoon) never advised me of a possible 24-yr. outcome. It in fact came as a complete shock. Also he never told me about a plea bargain at all. In fact our 3rd day in to the trial as he was telling me (not to worry) (trust him) and how at worst I would receive time served. This was after I asked him his success rate. When he told me I about fell over. Sir, I never had any confidence in this man and

_____

[7]     Given that petitioner has failed to identify any basis for deficient performance or prejudice arising from trial counsel's failure to investigate cell phone records, there is no basis for a claim of ineffective assistance of appellate counsel on this issue.

> he assured and re-assured me to trust his 20 yrs. experience.  Sir, even though I am innocent of forcing myself on this chick and she was left alone in her car, with her keys, etc.  How did a jury find me guilty is unbelievable, but if he would have persuaded me or even mentioned the 6 yr. offer Mrs. Ball once spoke of I would have jumped on it.  I can't stress enough how ineffective representation was.

At the outset, the court notes that petitioner does not discuss counsel's failure to present him with a plea offer as a stated ground for relief in Section I of the amended petition, entitled "Ineffective Assistance of Trial Counsel."  Thus, while petitioner mentions the issue in his July 2008 letter to appellate counsel, the issue is not a stated ground for relief currently before the court.

In any event, petitioner's "evidence" that a 6-year plea offer was ever made or that trial counsel never presented him with such an offer is insufficient in that it is not in the form of a signed declaration.  Additionally, assuming the 6-year offer was actually made but not presented by trial counsel, petitioner's letter to appellate counsel indicates that it would have fallen on deaf ears.  In particular, the court notes that petitioner's position, both at the time of trial and during his appeal, was "I am innocent."  Thus, the court cannot say that counsel acted deficiently by not conveying a plea offer inconsistent with petitioner's claim of innocence.  Nor, as to prejudice, can the court say that petitioner would have accepted any plea offer.[8]

### 3.   Orange Jail Shoes

As discussed above, the Supreme Court has held that compelling a criminal defendant to appear at trial before a jury wearing prison or jail clothing constitutes a due process violation and that the failure to raise an appropriate objection negates any compulsion.  See Estelle, 425 U.S. at 512-13.  In this case, petitioner contends that potential jurors – one of whom was eventually seated on his jury – saw him wearing jail issue orange shoes.  However, the record

---

[8]     Given the weakness of this claim, the court finds that appellate counsel was not deficient for deciding not to raise this claim on direct appeal.  Moreover, as appellate counsel advised petitioner, such a claim would have involved evidence outside the record and, as such, would not have been a proper claim on direct appeal.

1   does not establish that trial counsel ever raised an objection.  The issue is thus whether trial

2   counsel's failure to object, or appellate counsel's failure to raise the lack of objection on appeal,

3   constitutes ineffective assistance.

4          In the amended petition, petitioner states that he ". . .brought [the jail shoes issue]

5   to counsel's attention, unfortunately counsel elected to advise his client to simply keep his feet

6   under the table in hopes no one would see."  In support of this contention, petitioner offers his

7   May 30, 2011, declaration, attached to the amended petition as Exhibit 11.  In this declaration,

8   petitioner states: "I observed several potential jurors, at least one of which was seated on my jury,

9   appear to recognize their significance. . . ."[9]

10          The court finds that this declaration is insufficient to carry petitioner's burden.

11   First, as respondent notes, the declaration is not signed and, as such, does not constitute

12   "evidence" supporting the claim.  Second, the declaration is self-serving and is not accompanied

13   by any corroborating evidence.  Third, the declaration is speculative as to whether an actual

14   member of petitioner's trial jury saw him wearing jail-issue orange shoes.  Specifically, petitioner

15   states that "several potential jurors" appeared to recognize the significance of the orange shoes.

16   From this the court can only speculate as to whether any potential juror actually saw him wearing

17   orange jail shoes.  Moreover, assuming that a potential juror actually saw petitioner wearing

18   orange jail shoes, the court can only speculate as to whether that potential juror is the "at least

19   one" who was eventually seated on the jury that decided petitioner's case.  On the face of

20   petitioner's unsigned self-serving declaration,  is that no potential juror actually saw petitioner

21   wearing orange jail shoes and, even if some potential jurors did, that such potential jurors were

22   actually seated on the jury.

23   _____

24          [9]        Though not set forth in Exhibit 11, petitioner admits in the amended petition that,
following the one time a potential juror appeared to recognize the orange jail shoes, he was
25   provided with street shoes.  It thus appears that, despite petitioner's speculation that a potential
juror may have seen him wearing orange jail shoes, he was not wearing jail-issue orange shoes
26   when he appeared before the jury ultimately empaneled to decide his case.

1          4.     <u>Faith and Jerry Pearce</u>

2         The District Judge has directed the court to consider petitioner's assertions

3  regarding Faith and Jerry Pearce, identifying the amended petition at page 9, as well as

4  petitioner's July 23, 2008, letter to appellate counsel attached as Exhibit 23 to the amended

5  petition.[10]  At page 9, petitioner states as follows regarding the Pearces: "For example, Ms. Ball

6  [trial counsel before Mr. Rekoon] developed extensive impeachment files on . . . Faith Ann

7  Pearce.  (Exhibit 10)."  Exhibit 10 consists of state court and sheriff's office documents

8  reflecting that, in March 2004, Faith Pearce was charged with violation of California Penal Code

9  § 308(a), providing tobacco to a minor, and that the charge was later dismissed under California

10  Penal Code § 1385 for want of prosecution.  Neither Faith nor Jerry Pearce are referenced in the

11  July 23, 2008, letter to appellate counsel.

12         Petitioner's claim is conclusory.  Petitioner fails to state what "impeachment"

13  evidence exists that Mr. Rekoon should have pursued, despite his assertion that prior counsel

14  (Ms. Ball) had "developed extensive impeachment files."  Nor has petitioner shown how

15  evidence of the March 2004 charges against Faith Pearce, which did not involve truthfulness or

16  honesty, and which was dismissed for want of prosecution, would have tended to impeach her

17  testimony.  Most notably, petitioner has not identified which portions of the testimony from

18  either Faith or Jerry Pearce would have been impeached.

19  / / /

20  / / /

21  / / /

22  / / /

23

---

24      [10]    The District Judge's order also references page 89 of the amended petition, which is part of Exhibit 9 and consists of a document apparently produced by the El Dorado County Sheriff's Office which does not reference either Jerry or Faith Pearce.  The July 2008 letter is

25  found at Doc. 27-3, pages 39-42.  The District Judge's reference to "27-2 at 39," which is a California DMV report for Faith Pearce showing no violations or department action, appears to

26  have been intended to reference the July 2008 letter at Doc. 27-3.

**IV.  CONCLUSION**

Based on the foregoing, the undersigned recommends that petitioner's amended petition for a writ of habeas corpus (Doc. 27) be denied as to the remaining claims identified herein.

These supplemental findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 1, 2015

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE